**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| RAY ANTONIO AZCARATE, | Case No. 2:17-cv-02190-RFB-EJY |
| Petitioner, | **ORDER** |
| v. | |
| BRIAN WILLIAMS, et al., | |
| Respondents. | |

## I.     INTRODUCTION

Petitioner Ray Antonio Azcarate, who was found guilty of first-degree murder with the use of a deadly weapon and was sentenced to life without the possibility of parole plus a consecutive term of life without the possibility of parole for the deadly weapon enhancement, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. See ECF Nos. 7, 30-6. This matter is before this court for adjudication of the merits of Azcarate's counseled first amended petition, which alleges that the prosecution was improperly permitted to introduce prior bad act evidence, the prosecution withheld Brady materials, and his counsel failed to present mitigating evidence at the penalty phase. ECF No. 14. For the reasons discussed below, this court grants the petition.

## II.      BACKGROUND[1]

Patrol officers with the Las Vegas Metropolitan Police Department responded to a domestic violence call at an apartment complex in Las Vegas, Nevada on August 10, 2004. ECF No. 29-32 at 6–7. After entering the apartment, officers found a man "passed out on the floor" and Azcarate sitting on a couch. Id. at 13–14. Because Azcarate did not comply with the officers' directions to get on the floor, Azcarate was tased and then handcuffed. Id. at 15. Officers then found a woman, who identified herself as Stacey Jensen and who had a bloody lip and was "visibly shaken," in a back bedroom Id. at 15–18. Azcarate, who "appeared to be under the influence of either alcohol or something else," admitted hitting Jensen, his girlfriend. Id. at 18–20. Azcarate was arrested for battery domestic. Id. at 19.

Eight days later, on August 18, 2004, a 911 operator testified that she received a call at 9:18 p.m. and heard a woman screaming. ECF No. 29-29 at 88, 90–92. The call was disconnected, and when the operator called back, she spoke with a man who was uncooperative and disconnected the call. Id. at 95. The operator obtained the address for the owner of the cell phone and dispatched officers to that address because the first call "sounded violent." Id.  Detective George Sherwood testified that this 911 call was made by Jensen. ECF No. 29-32 at 63, 65, 67–68. In the audio recording of the 911 call, Jensen is heard screaming and crying, and a man is heard saying "[y]ou're gonna die" numerous times. ECF No. 62. When the 911 operator called the number back and asked what was happening, the man is heard saying "[s]omebody was playing games." Id.

---

[1] The court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the state court. This court's summary is merely a backdrop to its consideration of the issues presented in the case. Any absence of mention of a specific piece of evidence does not signify the court overlooked it in considering Azcarate's claims.

Ben Norgress testified that he lived in the same apartment complex as Azcarate. ECF No. 29-32 at 69–70. On August 18, 2004, Azcarate asked Norgress if Norgress knew where he could get a knife, and Norgress gave Azcarate a diving knife around noon that day. Id. at 78, 80. Later that day, Azcarate called Norgress and told him to come over to his apartment. Id. at 81. Azcarate let Norgress into the apartment, and Norgress saw Jensen laying on the floor. Id. At the time, Azcarate "was hearing voices and talking to himself," saying "women are witches and [he could not] get them out of [his] head." Id. at 82. Norgress saw "the knife . . . in a bag next to [Azcarate] on the couch," and it "looked like [Azcarate] had just mopped up the kitchen." Id. It appeared to Norgress that Azcarate was high on something at the time. Id. at 84. After Azcarate was arrested, Azcarate called Norgress and asked him to "[g]et his cell phone out of his apartment."[2] Id. at 85.

---

[2] Azcarate made 11 phone calls to Norgress from the jail following his arrests on August 10, 2004, and August 18, 2004. ECF No. 29-34 at 28. Those 11 phone calls were played for the jury. Id. at 29, 33–38. There was no testimony about what was said during those phone calls, and apparently no transcripts were ever made of those phone calls. See id. And because the audio recordings of those 11 phone calls were not originally included in the record, this court ordered Respondents to provide them. ECF No. 58. However, Respondents reported that those 11 phone calls were "unable to be reproduced due to being corrupted." ECF No. 61 at 2.

Although there is no testimony or other evidence of what was said during those 11 phone calls, this court notes that the prosecution referenced what was said during those 11 phone calls during closing argument. And notably, there was no objection by the defense that any of the prosecution's statements misrepresented the evidence. Those statements about the 11 phone calls includes the following: (1) Azcarate "said on those jail phone calls I kept my promise to her. That I gave her a two-minute warning, I went down to the car, I got this knife," (2) "You heard the phone calls after the beating. You heard about the way he talked about her. You heard about the fact that he got a knife. You heard about the way he talked on the jail phone calls about her. There's no question he had ill-will towards her," (3) "What did he say to [Norgress] on that jail phone call? Remember, I stashed [the knife] in the car," (4) "He described on the phone calls that he gave her a two-minute warning, basically, stop nagging me, and then he went outside and he got the knife," (5) "In those hour-and-a-half of phone calls [that] got played for you, and six of them were after the crime, think about how many times the defendant said, oh, I was just to[o] high I didn't know what I was doing. That would be never," (6) Azcarate "tells you that's what he was doing, he was cleaning up the crime scene," (7) "He tells [Norgress] exactly what happened. She was on me, on me, on me, and I gave her that two-minute warning, and then I went and got the knife, and I kept my promise to her," (8) "After the defendant is in custody, what does the defendant tell [Norgress]? You should have given me some more time. I would have gotten rid of some more stuff," and (9) "But then he

Sasha Kaster, a patrol officer, testified that she was one of the first responders to Azcarate's apartment on August 18, 2004. ECF No. 29-34 at 3, 11. Azcarate answered the door and told Kaster that "everything was fine." Id. at 11. After Officer Kaster asked Azcarate to show his hands, he moved enough for her to see a bloody body lying on the floor. Id. at 13. Jeff Smink, a senior crime scene analyst, testified that Jensen was laying "face up" in the living room with "a rose on top of her chest," a "What Would Jesus Do book" under her elbow, and a teddy bear at her side. ECF No. 29-32 at 23–24, 40. Smink also saw bloody clothes on the couch and a "diving type knife in a plastic sheath." Id. at 40–41. Thomas Whal, a senior forensic DNA analyst, testified that Jensen's blood was found on Azcarate's pants. ECF No. 29-33 at 14, 29. And Dr. Gary Telgenhoff, a forensics pathologist medical examiner, testified that Jensen, who suffered a stab wound to her left lung and heart, had old bruises on her left cheek and back left thigh. ECF No. 29-33 at 33, 40, 42–44.

Detective Dan Long testified that he spoke with Azcarate after arriving at the scene and described Azcarate's demeanor as follows: "He was cool to the touch. His heart rate was not excessive. He was not sweating. His eyes were normal. He had very coherent conversation with me. There was nothing out of the ordinary." ECF No. 29-34 at 22, 26. Detective Long was under the impression that Azcarate "was not at that time high or drunk." Id. at 27. A later blood test "revealed that [Azcarate] did have the metabolite from cocaine in his system." Id. at 39.

Azcarate's counsel admitted that Azcarate stabbed Jensen. ECF No. 29-32 at 5. However, Azcarate's counsel argued that Azcarate was only guilty of second-degree murder due to his mental state at the time of the homicide. ECF No. 29-38 at 16–17. The jury disagreed, finding Azcarate

---

and Ben make reference to, yeah, she drove you crazy, I know that. And don't worry, man, I told the police. I told them that you were insane." ECF No. 29-38 at 4–6, 8–9, 12, 15, 34–35, 37, 41.

guilty of first-degree murder with the use of a deadly weapon. ECF No. 29-36. Following the

penalty phase of the trial, the jury imposed a sentence of life without the possibility of parole. ECF

No. 29-37. The Nevada Supreme Court affirmed Azcarate's judgment of conviction and the denial

of his state post-conviction petition. ECF Nos. 30-49, 32-38.

## III.    GOVERNING STANDARDS OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus

cases under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application
>     of, clearly established Federal law, as determined by the Supreme Court of the
>     United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts
>     in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the

meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law

set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court." Lockyer v. Andrade, 538

U.S. 63, 73 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405–06 (2000), and citing Bell v.

Cone, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly

established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court

identifies the correct governing legal principle from [the Supreme] Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case." Id. at 75 (quoting Williams,

529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be

more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." Id. (quoting Williams, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102 (citing Lockyer, 538 U.S. at 75); see also Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

## IV.    DISCUSSION

### A.    Ground 1: Prior Bad Act Evidence

In ground 1, Azcarate alleges that his Fifth and Fourteenth Amendment rights to due process and a fair trial were violated when the prosecution was permitted to introduce prior bad act evidence—namely, the domestic violence incident on August 10, 2004—which only demonstrated he had a propensity for violence. ECF No. 14 at 8.

#### 1.    Background

Prior to trial, the prosecution moved to introduce evidence of Azcarate's "other crimes, wrongs or acts." ECF No. 28-33. Specifically, the prosecution argued that "the fact that [Azcarate] hit Jensen on August 10, 2004 and that she did not 'respect' him by bailing him out of jail soon thereafter is of important value to the murder which occurred on August 18, 2004." Id. at 5. Azcarate opposed the motion, arguing, *inter alia*, that "[n]ot only is the domestic incident

irrelevant to the issues of premeditation and deliberation on August 18, the domestic incident merely shows conformity therewith on the part of Mr. Azcarate, which is specifically prohibited under NRS 48.045." ECF No. 28-36 at 4. The state district court granted the motion, finding that "[t]he act is intertwined and has probative value which exceeds prejudicial effect, both as to premeditation, deliberation and malice, as well as motive, intent and absence of mistake or accident." ECF No. 28-39 at 8.

Later, during its closing argument, the prosecution made the following argument: "You heard the phone calls after the beating. You heard about the way he talked about her. You heard about the fact that he got a knife. You heard about the way he talked on the jail phone calls about her. There's no question he had ill-will towards her." ECF No. 29-38 at 5–6. And a little bit later, the prosecution made the following comment: "What evidence of deliberation do you know about? First, you know that he was mad at [Jensen] for not getting him out of jail." Id. at 7–8.

In response, Azcarate's counsel made the following comment during his closing argument: "It seems to me the State is arguing that when [Azcarate] was placed into custody [following the domestic battery incident] and he wasn't immediately bailed out, that he decided he was going to punish [Jensen] for doing that to . . . him." Id. at 17. During its surrebuttal closing argument, the prosecution corrected Azcarate's counsel's comment:

> Now, when I was listening to [Azcarate's counsel's] closing argument, he talked quite a bit about premeditation and deliberation and suggested to you that it's the State's theory that somehow the defendant chose or made the decision to kill [Jensen] eight days before the murder when he was arrested on the domestic violence.
> That's not the State's theory at all. And as you know, since you've heard the instructions on premeditation and deliberation, that's not what's required to meet the elements of premeditation and deliberation as well.
> Premeditation is simple. It's a decision to kill before you do it. It doesn't have to be a good decision. You don't have to consult experts. You don't have to chart it out. You don't have to graph it. You don't have to talk about it. You have to make a decision to kill someone before you do it. That's premeditation.

Deliberation is reflection on the fact that you're going to kill someone, simple as that. Doesn't require days, doesn't require weeks. It requires reflection on your actions.

And what do we know the defendant did in this case? He's irritated at [Jensen] that night. He tells her, look, you're getting a two-minute warning. That time evaporates. He's still mad at her.

Then what does he do? He thinks, hey, my knife's in that car. He decides to walk down and get it. He decides to get it from wherever it's stashed, and he comes back up to her, and he sticks it in her chest. He's decided to kill her at that point. He decided to kill her when he left the apartment to go get the knife.

Id. at 32–33.

### 2.   Legal Standard

"A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). "[C]laims deal[ing] with admission of evidence" are "issue[s] of state law," Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009), and "federal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764 (1990). Therefore, the issue before this court is "whether the state proceedings satisfied due process." Jammal v. Van de Kamp, 926 F.2d 918, 919–20 (9th Cir. 1991). In order for the admission of evidence to provide a basis for habeas relief, the evidence must have "rendered the trial fundamentally unfair in violation of due process." Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (citing Estelle v. McGuire, 502 U.S. 62, 67 (1991)). Not only must there be "*no* permissible inference the jury may draw from the evidence," but also the evidence must "be of such quality as necessarily prevents a fair trial." Jammal, 926 F.2d at 920 (emphasis in original) (citation omitted).

### 3.   State Court Determination

In affirming Azcarate's judgment of conviction on direct appeal, the Nevada Supreme Court held:

Azcarate argues that the district court erred by admitting evidence of his previous act of domestic violence without first conducting a <u>Petrocelli</u> hearing. He also alleges that the district court's failure to issue a limiting instruction prior to admitting the evidence warrants reversal.

This court has held that "[t]he trial court's determination to admit or exclude evidence of prior bad acts is a decision within its discretionary authority and . . . will not be reversed absent manifest error." <u>Braunstein v. State</u>, 118 Nev. 68, 72, 40 P.3d 413, 416 (2002). We conclude that the district court did not err in failing to hold a <u>Petrocelli</u> hearing because the prior bad act was sufficiently proven.

Under <u>Petrocelli v. State</u>, 101 Nev. 46, 692 P.2d 503 (1985), in order to admit evidence of prior bad acts, the district court must conduct a hearing outside the presence of the jury and determine "that: (1) the incident is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." <u>Tinch v. State</u>, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997) (citing <u>Walker v. State</u>, 112 Nev. 819, 824, 921 P.2d 923, 926 (1996)). Failure to conduct a <u>Petrocelli</u> hearing is not reversible error when the record establishes that the evidence is admissible under the above test, or that the result would have been the same had the evidence been excluded. <u>Petrocelli</u>, 101 Nev. at 52, 692 P.2d at 508.

In this case, the record established that Azcarate's prior domestic violence conviction was admissible under <u>Petrocelli</u>. The domestic violence incident was relevant to prove motive and intent with respect to the crime charged; the State's theory of the case was that Azcarate was mad at the victim for refusing to bail him out of jail after the domestic violence charge. The domestic violence incident was proven by clear and convincing evidence; Azcarate was convicted of the charge. Although Azcarate alleges that the domestic violence conviction was not sufficiently proven because of improper police testimony, he provides no evidence of this, nor does he provide a transcript of that proceeding. Finally, we agree with the district court that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Therefore, the evidence was admissible under the <u>Petrocelli</u> three-part test, and failure to conduct a <u>Petrocelli</u> hearing is not reversible error.

Azcarate also argues that the district court erred by failing to give the jury a limiting instruction when the evidence of the prior domestic violence incident was presented to the jury. This court has held that "the trial court must give a limiting instruction explaining the purposes for which the evidence is admitted immediately prior to its admission and a general instruction at the end of trial reminding the jurors that certain evidence may be used only for limited purposes." <u>Mclellan v. State</u>, 124 Nev. ___, ___, 182 P.3d 106, 111 (2008) (citing <u>Tavares v. State</u>, 117 Nev. 725, 733, 30 P.3d 1128, 1133 (2001)). We conclude that the failure to give a limiting instruction prior to admitting the evidence was harmless.

While a limiting instruction was not given immediately prior to the admission of this evidence, the district court gave a limiting instruction at the end of trial instructing the jurors that the evidence could only be used for limited purposes. Because the district court gave a limiting instruction before the case was

submitted to the jury, any error was harmless since it had no "'substantial and injurious effect or influence in determining the jury's verdict.'" <u>Tavares</u>, 117 Nev. at 732, 30 P.3d at 1132 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). We are convinced that Azcarate suffered no prejudice as a result of the district court's failure to give the limiting instruction prior to admission of the evidence.

ECF No. 30-49 at 3–5 (internal footnote omitted).

### 4.   Analysis

The introduction of evidence of Azcarate's domestic violence against Jensen on August 10, 2004, was certainly detrimental to Azcarate. However, it cannot be concluded that the admission of this evidence rendered his trial fundamentally unfair in violation of due process. <u>Estelle</u>, 502 U.S. at 67; <u>Sublett</u>, 63 F.3d at 930; <u>Jammal</u>, 926 F.2d at 920. As the Nevada Supreme Court reasonably noted, this evidence was admitted for the permissible purpose under Nevada law of showing Azcarate's motive and intent in killing Jensen. <u>See</u> Nev. Rev. Stat. § 48.045(2) ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.").

Azcarate argues that the Nevada Supreme Court's decision was (1) based on an unreasonable determination of the facts because it overlooked the improper argument made by the prosecution during its surrebuttal closing argument and (2) based on an unreasonable application of clearly established federal law. ECF No. 57 at 6, 8 (citing <u>Michelson v. United States</u>, 335 U.S. 469, 475 (1948) ("The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime."); <u>Old Chief v. United States</u>, 519 U.S.

172, 182 (1997) ("There is, accordingly, no question that propensity would be an 'improper basis' for conviction."). This court does not find that the Nevada Supreme Court overlooked the prosecution's surrebuttal closing argument or based its decision on an unreasonable application of clearly established federal law regarding propensity evidence.

As the Nevada Supreme Court reasonably decided, the prosecution's theory, at least in part, was that Azcarate was angry at Jensen for not respecting him and getting him out of jail following the domestic violence incident. The prosecution's correction of Azcarate's counsel's statement during its surrebuttal, explaining that it did not believe that Azcarate made the decision to kill Jensen at the time he was arrested for the domestic violence situation, does not contradict that theory. Rather, the prosecution made it clear that its theory was that Azcarate was angry at Jensen for those eight days between the domestic violence incident and that he then made the decision to kill her that night when she was nagging and disrespecting him.  Because the prosecution did not completely change its intent theory during its surrebuttal argument, the domestic violence evidence remained relevant and probative to facts of consequence: Azcarate's motive and intent to kill. Consequently, there was a permissible inference the jury could draw from the evidence, and Azcarate's argument that the evidence was only admitted for propensity purposes in violation of federal law is negated. In sum, because Azcarate's due process rights were not violated, the Nevada Supreme Court reasonably denied Azcarate's claim.

Further, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Yarborough, 568 F.3d at 1101 (citing 28 U.S.C. § 2254(d)); see also Dowling v. United States, 493 U.S. 342, 352 (1990) (explaining that the Supreme Court has "defined the category of infractions that violate

'fundamental fairness' very narrowly"). And importantly, the Supreme Court "has not yet made a ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." <u>Id.</u>

Thus, because the Nevada Supreme Court's denial of Azcarate's prior-bad-act-evidence claim was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts, Azcarate is not entitled to federal habeas relief for ground 1.

### B.  Ground 2: Withheld <u>Brady</u> Evidence

In ground 2, Azcarate alleges that his Fifth and Fourteenth Amendment rights to due process and a fair trial were violated when the prosecutor engaged in misconduct and withheld <u>Brady</u> materials—namely, photographs of Jensen from the domestic violence incident—from the defense. ECF No. 14 at 10.

### 1.  Background

Before trial, Azcarate moved for discovery, requesting the state district court "for an order requiring the Clark County District Attorney's Office to turn over all discovery to the Defendant." ECF No. 28-12. The prosecution responded that it would "permit discovery and inspection of any relevant material pursuant to the appropriate discovery statutes (NRS 174.235) and any exculpatory material as defined by the United States Supreme Court in <u>Brady</u>." ECF No. 28-29. In the prosecution's motion seeking to introduce the domestic battery incident from August 10, 2004, the prosecution explained that "[p]ictures of Jensen's injuries were taken." ECF No. 28-33 at 5.

During the prosecution's examination of the medical examiner, it asked about Jensen's "yellow/green contusions" on her left cheek. ECF No. 29-33 at 40. The following colloquy then took place:

> Q.   Based on the fact that it was yellow/green, does that tell you anything about how close to the time of death that injury would have occurred that caused that wound to her?
> A.   That would be a remote injury or an old injury. It would have nothing to do with the time of death.
> Q.   So when you talk about remote, you're talking days?
> A.   Yes.
> Q.   Would that would - - could it be consistent with eight days? Could it be consistent with happening eight days prior to?
> A.   Eight days?
> Q.   Yes.
> A.   Oh, yes.

Id. After the medical examiner testified about a bruise on Jensen's left thigh appearing to be "a number of days" old, the prosecutor asked, "could it have been eight days earlier that [Jensen] received that injury?" Id. at 42. The medical examiner answered in the affirmative. Id.

Later, during its closing argument, the prosecutor argued: "[Jensen] made some mistakes in life. God knows she should have never gone to that place with [Azcarate] after he beat her so badly that she still has bruises on her body nine, ten days later." ECF No. 29-38 at 4.

## 2.   **Legal Standard**

"[T]he suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999). The materiality of the evidence that has been

suppressed is assessed to determine whether prejudice exists. <u>Hovey v. Ayers</u>, 458 F.3d 892, 916 (9th Cir. 2006). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995). "A 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" <u>Id.</u> (quoting <u>Bagley</u>, 473 U.S. at 678).

### 3.    State Court Determination

In affirming Azcarate's judgment of conviction on direct appeal, the Nevada Supreme Court held:

> Azcarate argues it was error for the State not to disclose to the defense photographs of the injuries suffered by the victim as a result of the earlier domestic violence incident. We disagree. The photographs were neither exculpatory nor impeaching and Azcarate has failed to tell us how he was prejudiced.
>
> The United States Supreme Court held in <u>Brady v. Maryland</u> that the Due Process Clause imposes upon the State a duty and obligation to disclose "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963).
>
> Azcarate was not prejudiced by the State's failure to disclose to the defense photographs of the injuries suffered by the victim as a result of the earlier domestic violence incident. The photographs were neither exculpatory nor impeaching; it was not material to guilt or punishment. Thus, the State did not commit reversible error by failing to turn the photographs over to the defense.

ECF No. 30-49 at 5–6.

### 4.    Analysis

The Nevada Supreme Court reasonably concluded that (1) the photographs of Jensen following the August 10, 2004, domestic violence incident were not favorable to Azcarate and (2) the photographs were not material.[3] Indeed, because the photograph apparently showed Jensen's injuries following Azcarate's beating of her, it is unclear how these photographs would be exculpatory, impeaching, or material for Azcarate, especially since Azcarate does not articulate what the photographs showed. But even if the photographs did <u>not</u> show bruises on Jensen's body immediately after the August 10, 2004, domestic violence incident, thereby providing allegedly exculpatory evidence for Azcarate, Dr. Telgenhoff testified that "the first thing that happens when someone is bruised is there's a redness under the skin and that can go from a red to kind of a - - a blue/purple as time progresses, and then over a day or two possibly to a tan/brown color." ECF No. 29-33 at 37–38. Therefore, attempting to correct the prosecutor's closing argument or impeaching Dr. Telgenhoff with the photographs in an attempt to disprove that the older bruises on Jensen's body at the time of the autopsy were from the August 10, 2004, domestic violence incident would have been fruitless given that bruising does not show up immediately, thereby negating any materiality.

Accordingly, because the Nevada Supreme Court's denial of Azcarate's <u>Brady</u> claim was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts, Azcarate is not entitled to federal habeas relief for ground 2.

**C.    Ground 3: Failure to Present Mitigating Evidence in Penalty Phase**

---

[3] Further, it is worth noting that the prosecutor did not hide the existence of the photographs. Rather, as noted earlier, the prosecution filed a pre-trial motion mentioning that "[p]ictures of Jensen's injuries were taken." ECF No. 28-33 at 5.

In ground 3, Azcarate alleges that his Sixth Amendment right to the effective assistance of counsel was violated when his counsel failed to present mitigating evidence—namely, evidence that he suffered from a severe drug addiction problem and never received treatment—at the penalty phase of his trial.[4] ECF No. 14 at 13.

### 1.    Background

During the penalty phase, the jury was tasked with imposing one of the following sentences for Azcarate: (1) life in prison without the possibility of parole, (2) life in prison with the possibility of parole after 40 years, or (3) a definite term of 40 to 100 years in prison. ECF No. 29-37.

During the penalty phase of the trial, the prosecution admitted a certified copy of Azcarate's judgment for trafficking in a controlled substance from January 13, 1993, a certified copy of Azcarate's judgment for possession of a controlled substance from March 9, 1999, a certified copy of Azcarate's judgment for conspiracy to possess a controlled substance from April 21, 1999, a certified copy of Azcarate's judgment for possession of a controlled substance with intent to sell from April 29, 1993, and a trial transcript showing Azcarate's conviction for domestic battery against Jensen from August 10, 2004. ECF No. 29-38 at 49–50. The prosecution then called Jensen's parents to testify. Id. at 51–54.

Azcarate's counsel did not present **any** mitigating evidence. See id. at 55, 57. Instead, in support of the defense at the penalty phase, Azcarate "invoke[d] his right to allocution." Id. at 55. During that allocution, Azcarate made the following statements:

> And the drug problems, you know, that - - what we're going through and everything that, you know, my mind, I was, you know, look - - kind of losing my mind with the drugs, and I tried to, you know, help her to stop doing it, and I even offered that I will stop selling drugs to change her, raise a family, and it was kind of hard. It was very hard.

---

[4] The court previously dismissed "[t]he portions of Ground 3 unrelated to Petitioner's drug use . . . as untimely." ECF No. 42 at 11.

> . . . .
>
> I wanted - - I wanted to scare her, and I kept being pushed, and I was so high and, God, it's like the demon was around me.

Id. at 55–56.

Azcarate's counsel then made, *inter alia*, the following comments during his argument: (1) Azcarate "went down that road . . . paved with substance abuse and violence," (2) Azcarate "had a serious substance-abuse problem," (3) Azcarate's prior criminal history—besides the domestic violence incident—was all drug related, and (4) Azcarate is remorseful for Jensen's death. (Id. at 61–63.)

Following the penalty hearing, the jury imposed the most severe sentence: life without the possibility of parole. ECF No. 29-37.

In support of this ground, Azcarate points to the following information regarding his drug addiction which was never provided to the jury. See ECF No. 57 at 17. A forensic competency evaluation performed on Azcarate in May 2006 by Dr. John Paglini reported that Azcarate "used crack, cocaine and methamphetamines from 1996 to 1998, on a daily basis" and "use[d] crack and speed, five times a week, in 2000 to 2004, until the time of his arrest for murder." ECF No. 17-1 at 5. Another competency evaluation performed on Azcarate in May 2006 by Dr. Daniel T. Malatesta reported that "[a]t the time of the offense, he stated that he was on [crack cocaine, methamphetamine, marijuana, and alcohol and] had been using these substances approximately five out of seven days a week for the past nine years." ECF No. 17-2 at 4. Azcarate reported that he had "never been involved in any drug/alcohol treatment" and "believe[d] that the drugs had something to do with his distorted thinking." Id. at 4, 5. Dr. Malatesta diagnosed Azcarate with "substance induced psychotic disorder" and found that Azcarate's "abstinence from drugs ha[d]

17

1   improved his thinking processes." Id. at 6. Azcarate's Presentence Investigation Report ("PSI")

2   reported the following about Azcarate's substance abuse:

> The defendant stated his first use of alcohol began at the age of 2. He stated he
> drinks 4 days a week and reports his last use of alcohol on August 18, 2004. Since
> the age of 22, he stated he has used marijuana once or twice a week. He indicated
> his last use of this substance was in 2004. At [the age] of 27, he stated he used crack
> cocaine 5 days [a week] until August 18, 2004. At [the age] of 26, he stated he used
> methamphetamine 5 days [a week] until August 17, 2004. The defendant admitted
> to experimenting with acid (age 38), ecstasy (age 27) and heroin (age 30). He
> indicated he spends $300.00 per month to support his addiction and admits to being
> under the influence of crack cocaine, "speed," and alcohol during the instant
> offense.

9   ECF No. 17-3 at 4.

**2.    Legal Standard**

11      In Strickland v. Washington, the Supreme Court propounded a two-prong test for analysis

12   of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the

13   attorney's "representation fell below an objective standard of reasonableness," and (2) that the

14   attorney's deficient performance prejudiced the defendant such that "there is a reasonable

15   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

16   been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective

17   assistance of counsel must apply a "strong presumption that counsel's conduct falls within the

18   wide range of reasonable professional assistance." Id. at 689. The petitioner's burden is to show

19   "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed

20   the defendant by the Sixth Amendment." Id. at 687. Additionally, to establish prejudice under

21   Strickland, it is not enough for the habeas petitioner "to show that the errors had some conceivable

22   effect on the outcome of the proceeding." Id. at 693. Rather, the errors must be "so serious as to

23   deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

Counsel's performance at the penalty phase is measured against "prevailing professional norms." Id. at 688. And the Court "must avoid the temptation to second-guess [counsel's] performance or to indulge 'the distorting effects of hindsight.'" Mayfield v. Woodford, 270 F.3d 915, 927 (9th Cir. 2001) (citing Strickland, 466 U.S. at 689). Counsel's "performance [is] deficient only if, viewing the situation from his perspective at the time of trial, his decisions cannot be characterized as 'sound trial strategy.'" Id. (citing Strickland, 466 U.S. at 689); see also Correll v. Ryan, 539 F.3d 938, 948 (9th Cir. 2008) ("[U]nder Strickland, we must defer to trial counsel's strategic decisions."). When challenging a trial counsel's actions in failing to present mitigating evidence during the penalty phase, the "principal concern . . . is not whether counsel should have presented a mitigation case[, but instead] . . . whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable." Wiggins v. Smith, 539 U.S. 510, 522-23 (2003) (emphasis in original) (explaining that "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing"). "In assessing prejudice, [this Court] reweigh[s] the evidence in aggravation against the totality of the available mitigating evidence." Id. at 534; see also Strickland, 466 U.S. at 695 (explaining that "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant" the sentence imposed).

### 3.  De Novo Review

This Court previously determined that ground 3 was technically exhausted because it would be procedurally barred in the state courts. ECF No. 42 at 10. Azcarate previously argued that he could demonstrate cause and prejudice under Martinez v. Ryan, 566 U.S. 1 (2012) to excuse the default. Id. at 10–11. This Court agreed, finding that "the ineffective assistance of trial counsel

claim is substantial and Petitioner was prejudiced. The trial counsel's failure to prevent [sic] any mitigating evidence during the penalty phase of Petitioner's trial could have made a material difference to the sentence that Petitioner received, which constitutes a 'substantial and injurious effect or influence' on the outcome." Id. at 11 (emphasis in original). Accordingly, because this Court has already determined that the procedural default of ground 3 is excused, the issue before this Court now is, reviewing this ground de novo, whether, on the merits, Azcarate was denied effective assistance of counsel during the penalty phase regarding the lack of presentation of any mitigation evidence about his drug addiction. See Cone v. Bell, 556 U.S. 449, 472 (2009); Porter v. McCollum, 558 U.S. 30, 39 (2009); Atwood v. Ryan, 870 F.3d 1033, 1060 n.22 (9th Cir. 2017); Ramirez v. Ryan, 937 F.3d 1230, 1243 (9th Cir. 2019).

### 4.    Analysis

Azcarate's counsel was on notice that Azcarate had drug addiction issues that could be used in mitigation. See Jones v. Ryan, 52 F.4th 1104, 1117 (9th Cir. 2022) ("Classic mitigation evidence includes mental disorders, mental impairments, family history, abuse, physical impairments, and substance abuse."). In fact, he told the jury during the penalty phase that Azcarate "had a serious substance-abuse problem." ECF No. 29-38 at 61. However, Azcarate's counsel **did not present any evidence** during the penalty phase of the trial regarding how Azcarate's drug use affected his mental state and behavior, even though there was clear evidence in the record regarding this connection by way of Dr. Malatesta's competency evaluation. See Summerlin v. Schriro, 427 F.3d 623, 630 (9th Cir. 2005) ("The defendant's history of drug and alcohol abuse should also be investigated."). Indeed, Azcarate's counsel explained that Azcarate was a different person at the time of the trial as compared to the time he killed Jensen and made the jail calls and that "the drugs probably had a lot to do with it." ECF No. 29-38 at 63 (emphasis added). It is thus

inexplicable, especially given the severity of the sentence Azcarate was facing, why counsel would not then have presented the medical evidence in the record which supported Azcarate's theory of mitigation. Without the contextual and supporting medical expert evidence regarding how Azcarate was <u>specifically</u> affected by his drug usage, the bare fact of his drug usage failed to provide effective mitigation. Counsel's unsupported and generic reference to a 'drug problem,' without detailed competent expert evidence, was clearly inadequate. Moreover, it would also have provided independent corroboration of Azcarate's own allocution regarding the negative and violence-inducing effect drugs had on his behavior and how he changed after he stopped using them. Instead, counsel discussing Azcarate's drug usage without providing any expert medical opinion(s) of expert(s) who had examined Azcarate meant the jury made its sentencing decision without crucial mitigating evidence. Consequently, this Court finds that, because Azcarate's counsel provided incomplete and woefully inadequate information about his drug usage, Azcarate demonstrates that his counsel's representation fell below an objective standard of reasonableness. <u>Strickland</u>, 466 U.S. at 688; <u>see also</u> <u>Lambright v. Schriro</u>, 490 F.3d 1103, 1116 (9th Cir. 2007) ("To perform effectively . . . counsel must conduct sufficient investigation and engage in sufficient preparation to be able to present and explain the significance of all the available mitigating evidence.") (Internal quotation marks and brackets omitted).

Azcarate also demonstrates prejudice. The Court is confident that this mitigation evidence would have changed the jury's assessment that Azcarate was deserving of a sentence of life without the possibility of parole. The prosecution painted Azcarate as a man with a violent and angry disposition who was incapable of being rehabilitated. Indeed, the prosecution's theory at trial was that Azcarate was so angry at Jensen that he violently stabbed her to death after she nagged him and then failed to abide by his two-minute warning. This picture of Azcarate as an unrestrained

1   and uncontrollably abusive man with impulse control issues supported a finding by the jury that

2   Azcarate did not deserve a chance at life outside of prison.

3        However, the depiction of Azcarate's character presented to the jury by the prosecution

4   was substantially incomplete and heavily skewed without the missing mitigation evidence. In his

5   competency evaluation, Dr. Malatesta found that Azcarate suffered from "substance induced

6   psychotic disorder" and determined that "the medications that [were] prescribed to Ray Azcarate

7   at the jail [following his arrest for the killing], coupled with his abstinence from street drugs,

8   appear[ed] to have stabilized his mood and ha[d] apparently decreased his delusional thinking."

9   ECF No. 17-2 at 6, 7. The significance of this information cannot be overstated. Dr. Malatesta's

10  testimony at the penalty hearing would have shown the jury that Azcarate, when exposed to drugs,

11  suffered from a mental health problem which caused him to behave in a paranoid, delusional and

12  potentially violent manner. More importantly, Dr. Malatesta's testimony would have shown that

13  Azcarate had the capacity to benefit from treatment and medication to address his psychosis—that

14  is the capacity to be rehabilitated with proper medical treatment. This expert evidence

15  demonstrating that Azcarate suffered from a treatable medical condition would have demonstrated

16  to the jury that Azcarate's violent conduct as reflected in the offense could be eliminated through

17  proper treatment. The defense had a strong mitigation case to present by way of a medical expert

18  and his psychological evaluation and medical diagnosis.[5] This would have supported the

19  conclusion that Azcarate could be released from prison and not present a danger to the public.

20        Moreover, Dr. Malatesta's testimony would have contextualized the aggravation evidence.

21  In fact, rather than the jury assuming that Azcarate's mindset was purely violent at the time of the

22

23  [5]Indeed, given the unbiased, court-appointed evaluations of Dr. Paglini and Dr. Malatesta, Azcarate's trial counsel had a compelling basis to seek out a defense expert—one who perhaps could have supported the defense's mitigation case to an even further extent.

killing, Dr. Malatesta's testimony could have reshaped the jury's perception of Azcarate's frame of mind at the time of the killing, explaining that Azcarate was suffering from paranoia, hallucinations, and delusions. The jury heard none of this compelling mitigation evidence that was clearly known to defense counsel at the sentencing phase when Azcarate was facing life in jail without the possibility of parole.

The Court thus finds that, in reweighing the evidence in aggravation against the totality of the available mitigating evidence, the evidence in mitigation directly counterbalances and eclipses the aggravation evidence. See Wiggins, 539 U.S. at 534. Azcarate has therefore demonstrated that the failure to present compelling mitigation evidence about his drug-induced psychosis was significant enough that there was a substantial likelihood of him receiving a different sentence than life without the possibility of parole had his counsel presented it.  Azcarate is therefore entitled to federal habeas relief for ground 3.

## V.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Azcarate as it pertains to him receiving the full relief he requests: a new trial. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). This Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. See 28 U.S.C. § 2253(c); Turner v. Calderon, 281 F.3d 851, 864-65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citing Barefoot v. Estelle, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1)

whether the petition states a valid claim of the denial of a constitutional right and (2) whether this Court's procedural ruling was correct. See id.

Applying these standards, this Court finds that a certificate of appealability is warranted for ground 1. Reasonable jurists could debate whether the Nevada Supreme Court's decision denying Azcarate relief based on his state court's admission of his domestic violence incident was based on an unreasonable determination of the facts. The Court now provides a counterargument to its earlier holding to demonstrate how reasonable jurists could reach a different conclusion. The Nevada Supreme Court's decision that "[t]he domestic violence incident was relevant to prove motive and intent with respect to the crime charged" was based on the fact that "the State's theory of the case was that Azcarate was mad at the victim for refusing to bail him out of jail after the domestic violence charge." ECF No. 30-49 at 4. However, during surrebuttal argument, the prosecution stated that its theory was not that Azcarate "chose or made the decision to kill [Jensen] eight days before the murder when he was arrested on the domestic violence." ECF No. 29-38 at 32. Because this statement by the prosecutor directly contradicts the Nevada Supreme Court's finding of fact regarding the State's theory of the case, reasonable jurists could debate whether ground 1 should be reviewed de novo. And upon de novo review, reasonable jurists could debate whether the state court's evidentiary decision to allow evidence of the prior domestic violence incident rendered Azcarate's trial fundamentally unfair in violation of due process.

During surrebuttal argument, in addition to explaining that the State's theory was not that Azcarate chose to kill Jensen as a result of the bail issue, the prosecution explained that Azcarate was "irritated at [Jensen] that night[, h]e tells her, look, you're getting a two-minute warning. That time evaporates. He's still mad at her. . . . He decided to kill her when he left the apartment to go get the knife." ECF No. 29-38 at 33. Given that the State's theory was that Azcarate killed Jensen

because he was angry with her on the night of the killing, any discussion of Azcarate's prior violence was not relevant to prove motive or intent. Moreover, when moving for the admission of Azcarate's domestic violence incident prior trial, the prosecution argued that Azcarate's prior domestic violence towards Jensen was the cause of Azcarate's actions on the night of the killing. However, the prosecution shifted this theory during closing argument after the detrimental evidence of Azcarate's domestic violence had already been admitted. Accordingly, but for the prosecution presenting a different their theory of the case prior to trial to gain an unfair advantage regarding the admissibility of the domestic violence evidence, there was no permissible inference the jury was allowed to draw from the evidence. Further, the admission of this evidence rose to the level of preventing Azcarate from receiving a fair trial. The evidence of the domestic battery itself, Azcarate's five telephone calls from the jail following the incident, and Jensen's old bruises were all highly and unfairly prejudicial because they were used to demonstrate that Azcarate had a propensity for violence. It is difficult to imagine this impermissible character evidence not infiltrating the jury's deliberations and violating Azcarate's due process right to a fair trial.

## VI.     CONCLUSION[6]

**IT IS THEREFORE ORDERED** that the first amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 **[ECF No. 14] is GRANTED as to ground 3** and denied as to grounds 1 and 2. Petitioner Ray Antonio Azcarate's judgment of conviction is vacated. Within 60 days[7] of the later of (1) the conclusion of any proceedings seeking appellate or certiorari review of this court's judgment, if affirmed, or (2) the expiration for seeking such appeal or review, Azcarate must be given a new penalty hearing.

---

[6] Azcarate requests that this court conduct an evidentiary hearing. (ECF No. 14 at 18.) This court declines to do so because it is able to decide the petition on the pleadings.

[7] Reasonable requests for modification of this time may be made by either party.

**IT IS FURTHER ORDERED** that a certificate of appealability is granted as to ground 1 and denied as to ground 2.

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to (1) enter judgment accordingly, (2) provide a copy of this order and the judgment to the Clerk of the Eighth Judicial District Court for the State of Nevada, Clark County in connection with that court's case number C204931, and (3) close this case.

Dated: <u>April 17, 2024</u>

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

26